**Isaias Rodriguez RODRIGUEZ, Plaintiff, Appellant,**

v.

**SECRETARY OF The TREASURY OF PUERTO RICO, Respondent, Appellee.**

**No. 5557.**

United States Court of Appeals First Circuit.

March 30, 1960.

Elmer Toro-Lucchetti, San Juan, P. R., for appellant.

Carlos G. Latimer, Asst. Solicitor Gen., Santurce, P. R., with whom J. B. Fernandez Badillo, Solicitor Gen., San Juan, P. R., was on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

█ This is an appeal to review a decision of the Supreme Court of Puerto Rico which affirmed, without opinion, a judgment of the Superior Court. The only question before us is whether a decision against appellant Rodriguez, hereinafter called taxpayer, was necessarily wrong. We consider the record, of course, most strongly in favor of appellee Secretary of the Treasury, hereinafter sometimes called the government. At the same time, we cannot disregard findings of fact of the trial court in taxpayer's favor that are supported by evidence, or uncontradicted admissions elicited from government witnesses.

In 1947, within the period of the seven-year statute of limitations, a dispute arose concerning taxpayer's 1939–1941

income tax. Appellant and his wife retained an agent, one Villariny, to represent them. A written appointment of Villariny was filed with the government authorizing him to "handle all matters concerning our income-tax returns for the years beginning with 1939." While discussions were proceeding the statute was about to run, and twice Villariny, with taxpayer's approval, executed one-year waivers of the period of limitation. In July 1950, taxpayer, after conferences with officials of the Bureau of Income Tax, paid in some $31,000, the amount administratively determined to be due. However, this figure had not been verified by the final authorities and, to quote the Superior Court, "taxpayer 'was informed' in the Bureau that it was still necessary to examine what had been done with respect to figures only." As the statute was again about to run he was requested to execute further waivers, and was given printed forms which were unconditional in terms. The court found that taxpayer was "not inclined to sign," but that Villariny advised him to do so, and "also advised him to restrict or limit his waivers." The court further found that taxpayer "advised Villariny that they would have to be conditioned, otherwise he would have not signed them."

■ Taxpayer signed the waivers and gave them to Villariny to forward to the government. On August 14, 1950, Villariny did so, with a covering letter, reciting that the deficiency as presently determined had been paid in full. He added the following postscript:

"We understand that, in any event, these waivers apply exclusively to the deficiencies notified prior to the date of this notice for the years 1939 to 1941."

On evidence accepted by the court we must conclude this to have been the un-

derstanding of taxpayer, as well as of Villariny. The letter and the three waivers were received in the Bureau that day, and the Treasurer signed the forms in the space provided.

■ In 1951, long after the period of limitation would otherwise have expired, the government assessed new deficiencies for the years 1940–41, unrelated to those under consideration in 1950. Taxpayer has no defense on the merits. He pleads the statute of limitations, claiming that the waivers, in view of the postscript in the forwarding letter, are not applicable. The government's position is that the postscript was without effect, so that the waivers are to be taken as unconditional. Before discussing this contention, some further facts are pertinent. When the government received Villariny's original authorization to represent taxpayer, its practice was to accept waivers although signed only by an agent. Sometime in 1950 what was described by one witness as an "unlucky incident" occurred. According to government trial counsel, "several taxpayers appeared in Court to challenge the capacity of their attorney in fact to sign waivers." As a result the government changed its practice, and concluded not to accept waivers unless signed by the taxpayer himself, or by a representative with a more specific written power of attorney than that here given Villariny. The government admits that it did not make this practice public until 1951. The Bureau witness testified that neither taxpayer, nor Villariny, nor anyone else was notified, and the court so found.[1] It is clear that even giving full recognition to the new practice (disclosed or undisclosed) Villariny's authority to represent taxpayer was not varied, so far as the government was concerned, in any other respect. The government also concedes that a taxpayer is free to

---

1. "The taxpayer himself would have included the limitation or condition which was attached to Exhibit 8 by J. C. Villariny. *If he had been informed personally of the change in the practice* in the Treasury Department, then on August 14, 1950 *he would have signed himself the limitation which Villariny added* in his letter of that date." (Ital. suppl.) The government seeks to argue, although it admits it is "not completely clear," that there was evidence which "tends to indicate" that taxpayer and Villariny knew of the change in Bureau practice, but we regard such argument impermissible under the circumstances.

limit a waiver to any extent he desires. Buscaglia, Treas. v. Tax Court, Ana Maria Sugar Co., Intervenor, 1947, 67 P.R.R. 650; Clinica Julia, Inc. v. Secretary of the Treasury, 1954, 76 P.R.R. 476, 506–08. This does not mean, of course, that the government must accept a limited waiver. And in fact, an official of the Bureau testified that had the waiver been limited on its face, it would not have been accepted. However, this evidence must be taken as a whole, and the balance of his testimony was that had taxpayer not presented an acceptable waiver, a $2,000 jeopardy assessment would have been made as a protection in case the $31,000 payment proved inadequate on final check. In other words, no assessment would have been made with relation to the present matter, some $29,000 additional.

▆ We therefore have a record where a government representative asked a taxpayer for a waiver for a special purpose, but gave him an unlimited form, and the taxpayer executed and delivered the form, but instructed his agent whom he authorized to make the delivery to state that he understood that it was for that purpose only, and the government, with knowledge of that understanding, accepted the waiver, but secretly rejected the condition, and is now relying on the waiver to justify an assessment for a different matter, many times the size it would have made had no waiver been tendered. The court held the government had a right to do this. The question presented is whether there is a possible basis for supporting that conclusion.

The Superior Court concluded that the government was free to disregard the letter, and treat the waiver as a separate, and therefore unconditional document. Its reasoning was that "For the purposes of the waiver * * *, Villariny was no longer the representative, expressly authorized therefor, of the taxpayer," and that the letter simply stated "Villariny's *conclusions* and *opinions*. * * * The defendant [Treasurer], in turn, *understood* something else." (Ital. in original). All of this, except the last sentence of the second quotation, appears to us contrary to the express findings of fact made by the court. The balance, with all due respect, merely assumes the point. As already mentioned, the Supreme Court, in affirming, wrote no opinion. We proceed, therefore, to consider the government's brief. It makes the following arguments:

"A. The waiver signed by the taxpayer is not susceptible of being interpreted as including the condition expressed in Mr. Villariny's letter.

"B. The appellant is estopped from claiming that Mr. Villariny's letter limited the effect of the waiver he signed.

"C. Whatever power Mr. Villariny had been conferred by the appellant regarding waivers to the period of limitations was automatically revoked when his principal decided to act, and acted personally."

In support of point (A) the government says, "It is clear that a waiver of the period of limitations for the assessment of deficiencies which have already been paid by the taxpayer, as had happened in this case in effect waives absolutely nothing. Thus if the appellant's contention is to stand, it must follow that the taxpayer sent a meaningless document to the Treasurer and that the latter accepted it and was satisfied with such meaningless document. * * * [T]he only way to avoid labeling it a futile act was by discarding Mr. Villariny's postscript." This contention overlooks the plain factual findings. As the court said, "it was still necessary to examine what had been done with respect to figures only. * * * [P]rior to August 14, 1950, the Treasurer had [not] determined *definitely* the exact *total* amount * * *." Again, it speaks of the prior determination as "merely tentative." (All itals. in original). In other words, a waiver for the express purpose stated in the postscript was not only precisely in accord with what the court found to be the taxpayer's intent, but covered ex-

actly the contingency in which the Bureau professed concern.

■ However, the government does not let the matter rest there, but incorporates the same statement into its next argument, (B), estoppel. It says, "if the taxpayer * * * intended that his agent should render it worthless by limiting it to a situation that could not possibly exist, then his hands are not clean * * *. Clearly every element of estoppel is present." Estoppel is a poor doctrine for the government to invoke. If anything, the shoe is on the other foot. The right to assess a new, wholly unrelated deficiency, is a substantial matter. Cf. Porto Rico Railway, Light & Power Co. v. Buscaglia, Treas., 1943, 62 P.R.R. 572. Here is the government requesting a waiver for an announced special purpose, receiving it back in a letter which states that the taxpayer understands that it is solely for that purpose, and then using the waiver in order to make an assessment for an entirely different purpose. This in the face of unequivocal government testimony that had the waiver not been received it would have made a limited jeopardy assessment of $2,000 (none of which, so far as now appears, would have been required, or is presently involved), rather than for the $29,000 it now seeks. The government's claim of estoppel is without merit.

■ Appellee's final point, (C), is perhaps the nub of its argument—namely that taxpayer's personal execution of the waivers automatically revoked Villariny's authority with relation thereto. The government alleges, as a principle of Puerto Rican law, that an agent's authority "is automatically and necessarily revoked when his principal undertakes to perform the same act." The principle referred to, however, is not peculiar to Puerto Rican law, but, as the government itself states, "is also accepted in Anglo-American Law. Such concept is based on the fact that such conduct by the principal is, necessarily, conduct inconsistent with the agency." We fully accept the principle so defined, if it is understood

as merely indicating one method by which the principal may manifest an intent to revoke the agency. 1 Restatement, Agency 2d § 119, Com. (b) (1958). But here again, we have the vice underlying the government's two previous arguments, namely, the assumption that the letter if read into the waiver, destroyed the waiver and made it a "worthless document." Here again, the government overlooks the fact that the letter, rather than being "necessarily . . . inconsistent" with the principal's act, was both consistent, and in accordance with the principal's express instructions. The doctrine on which the government relies, in other words, is not applicable to the facts.

■■ We think the difficulties in this case may have stemmed from the government's practice not to accept waivers signed by agents without express written authorization more specific than that here given Villariny. This practice was for the government's protection in case of a claim that the agent had gone beyond his authority in binding the taxpayer to too much. We perceive no basis for applying it to an act by the agent that limits a taxpayer's obligation. But even if the practice were construed to mean the government did not choose to regard any letter from an agent as authorized, such undisclosed practice could not affect the principal. "The taxpayer was entitled to assume that the views of the Treasury Department remained the same until they were changed and the taxpayer was advised thereof." West India Oil Co. v. Buscaglia, Treas., 1948, 68 P.R.R. 733, 735. So far as the record is concerned, taxpayer had no reason to suppose that Villariny was not his recognized agent, with as full powers with respect to waivers as he had had in the past when the waivers themselves had been signed by him. The government might elect not to deal with taxpayer at all if he acted through Villariny. But the delivery of the waivers and the delivery of the letter was a single act, and the government could not accept the one and, by some private practice, choose to over-

look the other on the ground of not recognizing the agent's authority with respect to it. The letter must stand on the same basis that it would if taxpayer had written it himself.

 Nor could the government rely on a policy that it would not accept limited waivers even if executed by the taxpayer. There is no suggestion that the government informed taxpayer of any such policy. Even if it could be said to have done so by the act of giving him an unconditional form, the fact remained that taxpayer tendered a waiver for limited use, and the government accepted it with knowledge of the proposed limitation. Where an offeror presents two contemporaneous writings, even though one is formal and complete on its face, and the other informal, the offer is both. The other party is free to reject both. But it cannot accept the one, and disregard the other. Bond v. Wiegardt, 1950, 36 Wash.2d 41, 216 P.2d 196; V-1 Oil Co. v. Anchor Petroleum Co., 1959, 8 Utah 2d 349, 334 P.2d 760.[2] If the government had a practice not to accept limited waivers, and all it received was a limited waiver, it nonetheless could not unilaterally enlarge the waiver it received into something else.[3]

We find ourselves unable to escape the conclusion that the government had no possible right to rely upon a waiver asked for, and tendered for one explicitly expressed purpose only, to support an entirely different purpose. The government is seeking a windfall to which it is not entitled.

Judgment will enter vacating the judgment of the Supreme Court of Puerto Rico, and remanding the case for further proceedings.

2. We find singularly few cases on this subject, but nothing in favor of the government except the dissenting opinion in the V-1 Oil Co. case. That case involved, strictly, a qualified acceptance—a formal document, and covering letter—which the court held constituted a counter-offer, which should have been rejected if the other party was not agreeable thereto. The dissenting judge stated, without citation of authority, that the majority decision violated the parol evidence rule. That is not so. The parol evidence rule merely provides that the integrated contract must stand by itself, but the rule has no place in determining what constitutes the integrated contract. In a discussion of this point by Corbin, The Parol Evidence Rule, 53 Yale Law Journal 603, at 615, it was said,

"Signing a formal agreement and sending it along with a modifying letter to the other party does not so far integrate the contract as to prevent proof of the modifying letter. Retention by the other party and acceptance of performance will operate as an assent to the modification."

This matter is fully dealt with in the Wiegardt opinion. See also 1 Restatement, Contracts § 237, Com. (b) (1932), where the parol evidence rule is set forth so as to exclude its application in the case of contemporaneous writings relating to the same subject matter, because "both form part of the integration."

3. If it be said that a waiver is not a contract, but "a voluntary, unilateral waiver of a defense by the taxpayer," see Cia. Azucarera del Toa, Inc. v. Tax Court, 1951, 72 P.R.R. 850, 861, there is all the less reason for construing it to mean something greater than its stated intended scope. If the waiver was not a contract, the principle of estoppel may become applicable, see Cia. Azucarera, supra, at 863, but in that event, having in mind that it is not the $2,000 assessment the government is now seeking to make, we should be forced to hold that estoppel is presently against the government, not in its favor. The Cia. Azucarera case is also authority for the principle of Puerto Rican law that despite the language of the Income Tax Act of 1924, 13 L.P.R.A. § 779(b), the Treasurer need not sign a waiver. The government can therefore not rely on the fact that the Treasurer's signature was added only to the waivers and not to the letter.